# *Gardner v. Sage Ridge Sch.*

United States District Court for the District of Nevada

June 17, 2025, Decided; June 17, 2025, Filed

Case No. 3:24-CV-00403-CLB

**Reporter**
2025 U.S. Dist. LEXIS 114896 *; 2025 LX 196688

JELANI GARDNER, an individual, JELANI GARDNER, as guardian of minor child J. Doe, on his behalf, Plaintiffs, v. SAGE RIDGE SCHOOL, a Domestic Non-profit Corporation, DOES I-XX and ROE Entities I-XX, Defendants.

**Prior History:** *Gardner v. Sage Ridge Sch., 2025 U.S. Dist. LEXIS 19829, 2025 WL 384563 (D. Nev., Feb. 4, 2025)*

**Counsel:** [*1] For Jelani Gardner, as Guardian of minor child J. Doe, Plaintiff: Joseph S. Gilbert, LEAD ATTORNEY, Joey Gilbert Law, Reno, NV; Kendra J. Jepsen, Jepsen Law, PLLC, Reno, NV.

For J. Doe, Plaintiff: Joseph S. Gilbert, LEAD ATTORNEY, Joey Gilbert Law, Reno, NV; Sigal Chattah, Pvt, LEAD ATTORNEY, Chattah Law Group, Las Vegas, NV; Kendra J. Jepsen, Jepsen Law, PLLC, Reno, NV.

For Sage Ridge School, a domestic nonprofit corporation, Defendant: C. Michael Judd, Elena Vetter, LEAD ATTORNEYS, PRO HAC VICE, Parsons Behle & Latimer, Salt Lake City, UT; John A. Snow, LEAD ATTORNEY, Parsons Behle & Latimer, Reno, NV.

**Judges:** Carla Baldwin, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Carla Baldwin

## Opinion

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION TO DISMISS**

[ECF No. 29]

Plaintiffs Jelani Gardner, in his individual capacity ("Gardner"), and Jelani Gardner on behalf of his minor child J. Doe ("Doe") (collectively "Plaintiffs"), bring this action against Defendant Sage Ridge School ("Sage Ridge") for alleged violations of various federal and state civil rights protections and torts. Currently pending before the Court is Sage Ridge's motion to dismiss Plaintiffs' first amended complaint ("FAC") pursuant to [*2] *Fed. R. Civ. P. 12(b)(6)*. (ECF No. 29.) Plaintiffs opposed the motion, (ECF No. 35), and Sage Ridge replied, (ECF No. 37). For the reasons stated below, the Court grants in part and denies in part Sage Ridge's motion to dismiss.

### I. FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

Sage Ridge is a 501(c)(3) nonprofit corporation and independent school in Washoe County, Nevada. (ECF No. 26 at 4.) In April 2020, Sage Ridge received an emergency Paycheck Protection Program ("PPP" Loan) for $755,217 that was completely forgiven. (*Id.*)

---

[1] The facts as stated herein are taken from Plaintiffs' FAC. (ECF No. 26.)

Three years later, on April 17, 2023, Gardner signed an employment contract with Sage Ridge to become the school's Assistant Athletic Director, Head of Sage Ridge's Basketball Program, and Head Coach of the Boys' Basketball Team for a four-year period beginning with the 2023-2024 school year. (*Id.* at 7.) Gardner alleges that prior to signing the employment contract, he informed Sage Ridge's Head of School, Dr. Ginger Hovenic ("Dr. Hovenic"), that he suffers from kidney failure and requires an accommodation in the form of working mostly remotely to receive daily dialysis. (*Id.*) Gardner alleges Dr. Hovenic agreed to the accommodation. (*Id.*) During an initial meeting to discuss employment expectations, [*3] Gardner alleges Dr. Hovenic discussed the school's racial "quota of 80% white students and 20% black students" which would "facilitate community acceptance of the basketball team and of Gardner, as a black male." (*Id.* at 8.)

Soon after, Gardner enrolled his minor son, Doe, a black male, as a freshman at Sage Ridge. (*Id.*) Doe alleges that within the first few months of his time at Sage Ridge, he was repeatedly subjected to discrimination based on his race and gender. He further alleges he was shown sexually explicit content and subjected to uncomfortable conversations about sex by other students outside of school property. (*Id.*)

Doe also alleges during an outdoor education field trip in September of 2023, one Sage Ridge teacher asked Doe to "throw up the Blood hand sign" and then reported Doe for "throwing up gang signs." (*Id.*) During the same trip, a white male student accused another black student of stating "he would rape him until he could not walk." (*Id.* at 9.) Doe further alleges he was falsely accused of attempting to enter the tent of two female students at night and was then reprimanded by chaperones by "segregating the only two black students from the group of white students." [*4] (*Id.*) The following day, Doe alleges he was forced to walk at the back of the group as punishment. (*Id.*) Doe alleges he was also falsely accused of making sexually inappropriate remarks and was "embarrassed and extremely uncomfortable." (*Id.*) Doe was sent home, along with one black student and three white students, after the teachers "interrogated" him and stated they "trusted the students who made the accusations against Doe." (*Id.* at 9-10.) Subsequently, Doe was put on a ten-day informal suspension while the three white students were allowed to return to school the next Monday. (*Id.* at 10.)

Soon after, Plaintiffs allege the white students and parents made false police reports regarding the events of the field trip. (*Id.*) Following an investigation, the police found the claims to be meritless. (*Id.*) Gardner met with Dr. Hovenic and complained about the discriminatory treatment of Doe. (*Id.*) Gardner alleges Dr. Hovenic gave away his on-campus office to another coach. (*Id.*) Plaintiffs allege Dr. Hovenic later came to their home and suggested Doe withdraw from Sage Ridge. (*Id.*)

Once the school received the findings from the police investigation, Sage Ridge allowed Doe to return to school. [*5] (*Id.*) However, Plaintiffs allege Dr. Hovenic required Gardner and Doe to meet with all the concerned children and parents, almost all of whom were white, and forced Gardner and Doe to apologize for making them feel "uncomfortable" and "unsafe." (*Id.*) Gardner and Doe allege this caused them "humiliat[ion]" and "embarrass[ment]" even though the police investigation proved the accusations against Doe to be false. (*Id.* at 11.)

Following Doe's return to school, teachers refused to give him extra time to catch up on material he missed while on the informal suspension. (*Id.*) Doe alleges he was tested on the material without catch-up time and was accused of plagiarism. (*Id.*) Doe alleges "Sage Ridge expelled DOE without any explanation." (*Id.*)

Gardner continued his employment with the school despite his discomfort with the allegedly racially motivated negative treatment of Doe. (*Id.*) Gardner alleges his accommodation was revoked by Dr. Hovenic when Dr. Hovenic informed Gardner he needed to be on-campus more often, even though his office was given to someone else, and Gardner needed to complete daily dialysis. (*Id.*) On December 12, 2023, Gardner alleges Dr. Hovenic made the following remark to [*6] Gardner: "I don't know what black people want to be called: Black, Afro American, Colored." (*Id.* at 11-12.) Gardner states this comment made him feel "extremely uncomfortable and inferior, especially as it took place after Sage Ridge's discriminatory treatment of DOE." (*Id.* at 12.)

On March 5, 2024, Gardner was called into a meeting with Dr. Hovenic who criticized Gardner's absence from school and provided Gardner with a termination letter dated February 29, 2024. (*Id.*) Gardner was informed that his last day of employment would be April 15, 2024. (*Id.*) Gardner alleges the termination letter included an

employment contract between Sage Ridge and Gardner but the contract in the letter was not the actual contract agreed between the parties because it was "suspiciously missing the language that included a monetary buyout should Gardner be terminated 'without cause.'" (*Id.*) Gardner alleges that upon notice to Dr. Hovenic, he received copies of the actual contract between the parties. (*Id.*)

On July 18, 2024, Gardner filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1-1 at 6.) On July 19, 2024, Gardner's counsel received a Right-to-Sue [*7] letter. (*Id.*)

After obtaining the Right-to-Sue letter, Plaintiffs initiated the present suit against Sage Ridge. In the original complaint, Plaintiffs alleged the following eight causes of action: (1) "Violation of Title IX" - Plaintiff Doe; (2) "Violation of Title VI" - Plaintiff Doe; (3) "Violation of Title VI" - Plaintiff Gardner; (4) "Violation of Title VII" - Plaintiff Gardner; (5) "Violation of the ADA - Plaintiff Gardner; (6) "Violation of Nevada Statutory Protections" - Plaintiff Gardner; (7) Intentional Infliction of Emotional Distress - Plaintiff Doe; and (8) Intentional Infliction of Emotional Distress - Plaintiff Gardner. (ECF No. 1.) On October 10, 2024, Sage Ridge moved to dismiss all eight causes of action. (ECF No. 9.) On March 5, 2025, the Court granted Sage Ridge's motion to dismiss as to all claims, without prejudice and with leave to amend. (ECF No. 23.) The Court found each of Plaintiffs' claims as alleged in the original complaint to be insufficiently pled or improperly combining multiple theories of liability into single causes of action. (*Id.*)

On March 20, 2025, Plaintiffs filed the FAC with a jury demand. (ECF No. 26.) Plaintiffs allege the following twelve causes [*8] of action in the FAC: (1) "Violation of Title IX" - Plaintiff Doe; (2) "Violation of Title VI" - Plaintiff Doe; (3) "Violation of Title VI" - Plaintiff Gardner; (4) "Violation of Title VII" - Plaintiff Gardner; (5) "Retaliation Under Title VII" - Plaintiff Gardner; (6) "Retaliation under 42 U.S.C. § 1981" - Plaintiff Gardner; (7) Violation of the ADA - Plaintiff Gardner; (8) "Discrimination in Violation of NRS 613.330" - Plaintiff Gardner; (9) "Retaliation in Violation Nevada Statutory Protections" - Plaintiff Gardner; (10) Intentional Infliction of Emotional Distress - Plaintiff Doe; (11) Intentional Infliction of Emotional Distress - Plaintiff Gardner; and (12) "Negligent Supervision and Retention" - Plaintiff Gardner. (*Id.*) On April 3, 2025, Sage Ridge moved to dismiss the FAC. (ECF No. 29.) On May 1, 2025, Plaintiffs filed their response. (ECF No. 35.) On May 8, 2025, Sage Ridge filed their reply to Plaintiffs' response. (ECF No. 37.)

## II. LEGAL STANDARD

### A. Rules 8 and 10

A complaint must contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. "Each allegation must be simple, concise, and direct." *Fed. R. Civ. P. 8(d)(1)*. A district court has the power to dismiss a complaint when a plaintiff [*9] fails to comply with Rule 8. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058-59 (9th Cir. 2011)*; *Nevijel v. N. Coast Life Ins. Co., 651 F.2d 671, 673 (9th Cir. 1981)*. If the factual elements of a cause of action are not organized into a short and plain statement of a particular claim, the court may dismiss for failure to comply with Rule 8. *Sparling v. Hoffman Constr. Co., 864 F.2d 635, 640 (9th Cir. 1988)*. Under Rule 8, a plaintiff may not allege extraneous facts that are not part of the factual basis for a particular claim. *See Knapp v. Hogan, 738 F.3d 1106, 1109 (9th Cir. 2013)* (recognizing that Rule 8 is violated when a plaintiff pleads too much).

Rule 10 provides that a "party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances .... If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count ...." *Fed. R. Civ. P. 10(b)*. In *Bautista v. Los Angeles County*, the Ninth Circuit held that the district court properly exercised its discretion of dismissing a complaint for failing to comply with Rule 10 by separating counts where multiple claims were alleged but abused its discretion when the complaint was dismissed with prejudice. *See 216 F.3d 837, 841-42 (9th Cir. 2000)*.

**B. Rule 12(b)(6)**

Under Rule 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A complaint challenged "by a Rule 12(b)(6) motion to dismiss does not need detailed [*10] factual allegations" but requires plaintiff to provide actual grounds for relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Generally, a motion to dismiss pursuant to Rule 12(b)(6) tests the "legal sufficiency of the claim." Conservation Force v. Salazar, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)). "In reviewing a motion to dismiss pursuant to Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014); see Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

The Ninth Circuit has found that two principles apply when deciding whether a complaint states a claim that can survive a 12(b)(6) motion. First, to be entitled to the presumption of truth, the allegations in the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011); see Iqbal, 556 U.S. at 678. Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, "must plausibly suggest an entitlement to relief." Baca, 652 F.3d at 1216.

Dismissal is proper only where there is no cognizable legal theory or an "absence of sufficient facts alleged to support a cognizable [*11] legal theory." Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 965 (9th Cir. 2018). "'In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.'" Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (emphasis in original) (quoting Schneider v. Cal. Dep't. of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir.1998)).

A court can grant a motion to dismiss for failure to state a claim with leave to amend. Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty., 708 F.3d 1109, 1113 (9th Cir. 2013). When considering whether to allow amendment, courts consider various factors, including: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) the futility of the amendment; and (5) whether the plaintiff has previously amended his complaint. Desertrain v. City of Los Angeles, 754 F.3d 1147, 1154 (9th Cir. 2014). Usually, leave to amend is only denied when it is clear the deficiencies of the complaint cannot be cured by amendment. See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 956 (9th Cir. 2013). Whatever the reason, the court must explain denying a party leave to amend. Sharkey v. O'Neal, 778 F.3d 767, 774 (9th Cir. 2015). The Court may consider "[f]acts raised for the first time in the plaintiff's opposition papers . . . in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice." Broam, 320 F.3d at 1026 n.2.

**III. DISCUSSION**

**A. Plaintiffs' Title VI and Title IX Claims (First, Second, and Third Causes of Action)**

Plaintiffs' first three cause of action arise under Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 601, 78 Stat. 252 (codified at 42 U.S.C. § 2000d et seq.) and Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, § 901(a), 86 Stat. 235 (codified at 20 U.S.C. § 1681(a)). [*12] (ECF No. 26.) Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). For Titles VI and IX to apply to Sage Ridge, Gardner

must demonstrate that Sage Ridge is "receiving federal financial assistance." See *U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986)*.

Gardner asserts Sage Ridge receives federal funding in two forms: (1) *501(c)(3)* tax-exemption status, and (2) PPP Emergency Relief Loans that were disbursed and forgiven by the federal government. (ECF No. 26.) Neither Titles VI or IX define "federal funding assistance" nor do they prescribe the applicative effect when an organization is "receiving" federal funds. There is no controlling authority on either issue as to whether obtaining tax-exemption or a PPP loan permits enforcement of Titles VI and IX.

1. Tax-Exemption [*13] Status

Within the Ninth Circuit, district courts are split as to whether *501(c)(3)* tax-exempt status permits enforcement of Titles VI and IX. Compare *Doe v. Horne, No. CV-23-00185-TUC-JGZ, 2023 U.S. Dist. LEXIS 240844, 2023 WL 11892137, at *4 (D. Ariz. Dec. 11, 2023)* ("[T]ax-exempt status is not the type of grant or arrangement that qualifies as federal financial assistance.") with *E.H. by & through Herrera v. Valley Christian Acad., 616 F. Supp. 3d 1040, 1049-50 (C.D. Cal. 2022)* ("[T]ax-exempt status is a form of federal financial assistance that would subject the institution to Title IX.").

Sage Ridge points the Court to *Paralyzed Veterans of America* where the Supreme Court held: "[u]nder the program-specific statutes, Title VI, Title IX, and *§ 504*, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *477 U.S. 597, 605, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986)*. Focusing on *§ 504 of the Rehabilitation Act of 1973*, the Court concluded that "[b]y limiting coverage to recipients, Congress imposes the obligations of *§ 504* upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id. at 606*. "Congress tied the regulatory authority to those programs or activities that *receive* federal financial assistance; the key is to identify the recipient of that assistance." *Id. at 607* (emphasis in original). Furthermore, in [*14] *Gebser v. Lago Vista Indep. Sch. Dist.*, the Court held that Title IX works by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)*. In a recent opinion, the Supreme Court stated that in the context of children seeking disability accommodations in schools, the conditions to abide to "applicable antidiscrimination laws" apply once an entity "*accepts* the [] financial assistance." *A.J.T. v. Osseo Area Sch., No. 24-249, 605 U.S. ___, 2025 U.S. LEXIS 2279, 2025 WL 1657415, at *3 (2025)* (emphasis added). In concurrence, Justice Thomas remarked,

> we have repeatedly characterized *Spending Clause* legislation as much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions. Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract. Thus, this Court has held that if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*A. J. T., 2025 U.S. LEXIS 2279, 2025 WL 1657415, at *10* (Thomas, J., concurring) (cleaned up) (quoting *Barnes v. Gorman, 536 U.S. 181, 186, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002)*; *Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981)*).

The Court reads *Paralyzed Veterans* [*15] *of America, A. J. T.*, and *Gebser* to require Sage Ridge to have directly accepted, earned, provided, delivered, or given by contract some form of money, property, or resource for Titles VI and IX to cover Sage Ridge. Such reading is further supported by *Walz v. Tax Commission of City of New York* where the Supreme Court held in the context of *Establishment Clause* violations, "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches ...." *397 U.S. 664, 675, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970)*.

As the District of Arizona in *Horne* found, "'[t]ax-exempt status' is not listed as a form of federal financial assistance in the Department of Education's definition and tax-exempt status is not assistance 'authorized or extended under a law administered by the Department,' as the introductory phrase of the regulatory definition requires." 2023 U.S. Dist. LEXIS 240844, 2023 WL 11892137 at *2 (citing 34 C.F.R. § 106.2(g)). 501(c)(3) entities "are exempt from taxation unless denied tax exemptions under other specified sections of the [Internal Revenue] Code." *Bob Jones Univ. v. United States*, 461 U.S. 574, 577 n.1, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983) (citing 26 U.S.C. § 501(a)). As other courts have likewise noted, "Congress may condition tax-exempt status on an organization conforming to specific categories in Section 501(c)(3), [but] that was not the power that Congress invoked to subject entities to the nondiscrimination **[*16]** requirements of Title IX." *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*, 134 F. Supp. 2d 965, 972 (N.D. Ill. 2001); *see Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n*, 96 F.4th 707, 715 (4th Cir. 2024) ("[T]ax exempt status pursuant to 26 U.S.C. § 501(c)(3) does not equate to 'receiving Federal financial assistance' for purposes of Title IX."); *Doe by & through Doe v. Currey Ingram Acad.*, 721 F. Supp. 3d 682, 688 (M.D. Tenn. 2024).

On the other hand, the Central District of California in *Valley Christian Academy* found tax-exempt entities to permit enforcement of Titles VI and IX. 616 F. Supp. 3d at 1050. The Court noted the purpose of the provisions was "to eliminate discrimination in programs or activities benefitting from federal financial assistance. Distinctions as to the method of distribution of federal funds or their equivalent seem beside the point ...." *Id.* (quoting *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972)). This Court respectfully disagrees with *Valley Christian Academy*. 501(c)(3) status does not entitle one to money based purely on election of the status. *See* 26 U.S.C. § 501. While the IRS designation may allow a tax-exempt entity to allocate more resources toward its mission, rather than to the payment of taxes, the entity does not accept, receive, or "get" money from the federal government. *See A. J. T.*, 605 U.S. at __, 2025 U.S. LEXIS 2279, 2025 WL 1657415, at *3; *Walz*, 397 U.S. at 675. The designation provides a benefit to such entities of not having to pay taxes on certain types of earned income which would otherwise be taxed. *See* 26 U.S.C. § 501(a). But the benefit itself is not an affirmative transfer of money (or property, services, or some other resource) **[*17]** from the federal government to the entity. *See Walz*, 397 U.S. at 675.

Plaintiffs assert that *Paralyzed Veterans of America* is limited to § 504 of the Rehabilitation Act and thus does not apply to Titles VI and IX. (ECF No. 35 at 4.) Plaintiffs cite to *Regan v. Taxation With Representation of Washington* where the Supreme Court held that a "tax exemption has much of the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income." 461 U.S. 540, 544, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983). However, this Court does not find *Regan* to be persuasive. As Sage Ridge correctly points out, the Court's holding in *Regan* focuses on whether rules prohibiting 501(c)(3) entities from engaging in lobbying activity violate the First and Fifth Amendments. *See* 461 U.S. at 542. The Court's analysis here is better guided by *Paralyzed Victims of Am.*, *A. J. T.*, and *Walz*. Federal financial assistance is construed broadly to include those who receive the aid, but tax-exemption status does not confer onto Sage Ridge any amount of money, a grant, a loan, aid, or a "contractual" promise. *See Paralyzed Victims of Am.*, 477 U.S. at 605-06.

Accordingly, the Court finds that Sage Ridge's status as a 501(c)(3) is not federal financial assistance that permits enforcement of Titles VI and IX upon Sage Ridge.

## 2. PPP Funding

Alternatively, Gardner asserts that Titles VI and IX cover **[*18]** Sage Ridge because they received a PPP loan. (ECF No. 26 at 4-5.) Unlike tax-exemption status, Sage Ridge received money from the federal government in 2020 through a PPP loan that was forgiven in its entirety. (*Id.* at 5.) However, PPP loans were not "ordinary." *See Radix L. PLC v. Silicon Valley Bank*, 507 F. Supp. 3d 1141, 1143 (D. Ariz. 2020). Given the nature of the COVID-19 Pandemic and the urgency behind the PPP loans, it is likely that little thought was given as to whether such loans counted as "receiving federal financial assistance." Nevertheless, the Court endeavors to determine whether such loans permit application of Titles VI and IX.

PPP loans were enacted by Congress by the *Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")* during the unprecedent COVID-19 Pandemic. *See* 15 U.S.C. § 636(a)(36). The CARES Act and the PPP loans programs were enacted as "assistance and [a] health care response for individuals, families, and businesses affected by the coronavirus pandemic." *Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020)* (to be codified at 13 C.F.R. pt. 120). PPP loans were enacted to assist small businesses to continue operations and "keep[] workers paid and employed across the United States" during the COVID-19 crisis. *Id.* Unlike typical SBA loan programs, a PPP loan could be made to "any [small] business," non-profit organization, **[*19]** and other organization or business concern that qualifies as small under industry-specific rules. 15 U.S.C. § 636(a)(36)(D)(i). The SBA's guidance regarding the PPP loans notes that while the loans were eligible "for forgiveness of up to the full principal amount," the nature of the program was "temporary." *85 Fed. Reg. 20811*. The loans were based on eight weeks of payroll and business costs. *Id.* Loans issued before June 5, 2020 had a maturity date of two years. *Id. at 20813*. But nowhere in the statutes or federal regulations regarding the PPP loans are there any references or clear conditions to abide by Titles VI or IX. *See* 15 U.S.C. § 636; 85 Fed. Reg. 20811.

Looking to other forms of federal emergency relief, regulations from the Federal Emergency Management Agency ("FEMA") specifically "effectuate the provisions of *Title VI of the Civil Rights Act of 1964*," 44 C.F.R. § 7.1, and "Title IX of the Education Amendments of 1972," 44 C.F.R. § 19.100. To receive FEMA funding, FEMA requires applicants to submit "assurances . . . that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 44 C.F.R. § 19.115(a). Unlike FEMA disaster relief, SBA guidance does not call out to Title VI or IX. *See* 85 Fed. Reg. 20811. Thus, the Court will not read in requirements for **[*20]** recipients of PPP loans, absent other forms of federal funding, to comply with Title VI or IX.

Additionally, per Titles VI and IX, Sage Ridge must be *receiving* federal assistance. As the Middle District of Tennessee aptly noted: "use of the word 'receiving'—the present participle of 'receive'—makes it unequivocally clear that the program or activity at issue must be receiving, or 'com[ing] into possession of,' such assistance." *Welch v. United Network for Organ Sharing, 767 F. Supp. 3d 746, 778 (M.D. Tenn. 2025)*, *adhered to on reconsideration*, No. 3:24-CV-00422, 2025 U.S. Dist. LEXIS 46909, 2025 WL 824137 (M.D. Tenn. Mar. 14, 2025) (citing Receive, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/receive (last visited February 14, 2025)). As another Court found, an entity's receipt of a PPP loan constituted "'federal financial assistance' and had to comply with Title IX for the *life* of its loan." *Karanik v. Cape Fear Acad., Inc., 608 F. Supp. 3d 268, 284 (E.D.N.C. 2022)* (emphasis added). Sage Ridge received the loan in April 2020 for expenses covering the school the following eight weeks. The Paycheck Protection Program ended on May 31, 2021. The PPP loan that Sage Ridge received matured in April of 2022 and was forgiven in its entirety. (ECF No. 26 at 5.) Sage Ridge and Gardner did not sign their employment contract until April 17, 2023 and Doe did not enroll at Sage Ridge until later in 2023. ( **[*21]** *Id.* at 7-8.)

The Court finds that permitting application of Titles VI and IX under the circumstances of this case would permit application of the statutes indefinitely and in situations where agreements between the federal government and entities have concluded. The Court acknowledges the unprecedent circumstances of the COVID-19 Pandemic and the needs of thousands, if not millions, of businesses. But absent clear Congressional intent or federal regulatory authority, the Court will not read in Title VI or IX requirements many years past the issuance of the limited and emergency PPP loan that Sage Ridge received in 2020. *See Pennhurst State Sch. & Hosp., 451 U.S. at 17* ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

Accordingly, the Court finds that Plaintiffs have not sufficiently alleged that Sage Ridge receives federal financial assistance such that Sage Ridge is subject to Titles VI and IX. Thus, Plaintiffs have not sufficiently alleged claims under Title VI and IX. Furthermore, amendment to Plaintiffs' Title VI and IX claims would be futile because no set of facts can be added to Plaintiffs' Title VI and IX claims that would constitute a valid and sufficient claim. **[*22]** *See Doe v. Nevada, 356 F. Supp. 2d 1123, 1125 (D. Nev. 2004)* (citation and quotation omitted). Accordingly, the Court dismisses Plaintiffs' Title VI and IX claims with prejudice.

**B. Gardner's Claims Under Title VII and Nevada State Law**

Gardner raises two causes of action under Title VII for racial discrimination (fourth cause of action) and retaliation (fifth cause of action). (ECF No. 26 at 16-20.) Gardner also raises identical claims of racial discrimination (eighth cause of action) and retaliation (ninth cause of action) under Nevada state law, NRS 613. (*Id.* at 22-25.) Because claims of race and disability discrimination and retaliation under NRS 613 are evaluated under the same standards as the corresponding federal statutes and Gardner incorporates the allegations of his federal claims into his state claims, the Court analyzes his federal and state claims of racial discrimination and retaliation in parallel. *See Campos v. Town of Pahrump, 274 F. Supp. 3d 1106, 1116 (D. Nev. 2017)* ("The Nevada Supreme Court has found that Nevada's anti-retaliation statute tracks Title VII under federal law."); *Pope v. Motel 6, 121 Nev. 307, 114 P.3d 277, 280 (Nev. 2005)* ("In light of the similarity between Title VII of the 1964 Civil Rights Act and Nevada's anti-discrimination statutes, we have previously looked to the federal courts for guidance in discrimination cases.").

**1. Race Discrimination Under Title VII[2] (Fourth Cause of Action) and [*23] Nevada State Law (Eighth Cause of Action)**

Sage Ridge argues that "Gardner's Title VII discrimination claim does not pass muster." (ECF No. 29 at 14-16.) Sage Ridge argues the FAC "still does not allow the Court to analyze which theory of liability" Gardner is alleging. (*Id.* at 15.) In the FAC, Gardner broadly labels the fourth cause of action as a "Violation of Title VII - 42 U.S.C. § 2000e-3(a) Et. Seq.," but does not specify what aspect of Title VII is the basis of the alleged violation. (ECF No. 26 at 18-20.) In response, Gardner asserts he has pled the elements of a prima facia case of racial discrimination but does not make clear the specific theory of liability. (ECF No. 35 at 16.) In its order dismissing the original complaint, the Court warned Plaintiffs regarding the issues of "lumping" together multiple claims into one cause of action. (ECF No. 23 at 8.)

Title VII prohibits employers from discriminating against an individual based on race. *Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008)* (citing 42 U.S.C. § 2000e-2(a)(1) (2003)). Title VII permits a plaintiff to raise racial discrimination claims under multiple theories of liability: hostile work environment, disparate treatment, disparate impact, and retaliation. *See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004)* (Hostile Work Environment); *Freyd v. Univ. of Oregon, 990 F.3d 1211, 1224-28 (9th Cir. 2021)* (Disparate Treatment, Disparate Impact); *Manatt v. Bank of Am., N.A., 339 F.3d 792, 800-01 (9th Cir. 2003)* (retaliation). However, [*24] each theory, must be raised <u>independently</u>. *See Swafford v. Int'l Bus. Machines Corp., 383 F. Supp. 3d 916, 925 (N.D. Cal. 2019)* ("Not only is the title of the claim incomplete because it fails to mention the [correct statute], but also lumping all of these claims together into one cause of action is improper."); *Hayek v. HCAL, LLC, No. 11-cv-608, 2011 U.S. Dist. LEXIS 132677, 2011 WL 6819075, at *4 (S.D. Cal. Nov. 17, 2011)* ("[W]hen the pleading reflects a jumble of legal causes of actions and theories that fails to give defendants fair notice of what the plaintiff's claims actually are and the grounds upon which they rests, the complaint does not meet the standards of Rules 8 or 12.").

The Court's reading of the fourth cause of action again leads to the conclusion that "Plaintiff's Title VII cause of action includes multiple claims each requiring different elements, defenses, discovery and bases of judgment." *See Larios v. United States Navy, No. 21-cv-1947-GPC-MDD, 2022 U.S. Dist. LEXIS 245650, 2022 WL 20717421, at *4 (S.D. Cal. July 29, 2022)*. While Gardner has separately asserted claims of retaliation under Title VII and NRS 613 as his fifth and ninth causes of action, which the Court addresses below, the Court cannot discern the alleged theory of liability within the fourth and eighth causes of action. Here, Gardner asserts the "terminat[ion] [of] his

---

[2] Title VII "specifies, as a prerequisite to its application, the existence of a particular fact, *i.e.*, 15 or more employees." *Arbaugh v. Y&H Corp., 546 U.S. 500, 513, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*; *see* 42 U.S.C. § 2000e(b). Gardner provides Sage Ridge's PPP loan information which states Sage Ridge reported 67 jobs. (ECF No. 26 at 5.) Sage Ridge does not argue that Title VII does not apply to them.

employment as retaliation," (ECF No. 26 at 19, ¶ 110), which goes to a retaliation claim. *See Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 847 (9th Cir. 2004)*. In the next paragraph, Gardner alleges that Dr. Hovenic made insulting **[*25]** comments to Gardner regarding his race, (ECF No. 26 at 19, ¶ 109), which goes to a hostile work environment claim. *See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)* ("Title VII affords the right to work in an environment free from discriminatory intimidation, ridicule, and insult."). Gardner further alleges facts regarding his son and his gender, but these have nothing to do with racial discrimination, which the Court understands as the overarching theme of the fourth cause of action. (*See* ECF No. 26 at 18-19, ¶ 105.)[3]

Again, it is difficult for the Court to discern whether Gardner has alleged a plausible claim for relief because numerous Title VII allegations are merely lumped together into one cause of action. The Court finds that Gardner has violated *Rules 8* and *10* by combining multiple theories of liability into one cause of action. *Motallebi v. Bank of Am. Corp., No. 20-cv-4618-DSF, 2020 U.S. Dist. LEXIS 265713, 2020 WL 13327502, at *3 (C.D. Cal. July 2, 2020)* ("Combining separate legal claims under one cause of action is improper under *Rule 8*.")

Accordingly, Gardner has not sufficiently pled a plausible claim for relief within his fourth and eighth causes of action and the Court again grants dismissal without prejudice and with leave to amend. *See Cafasso, U.S. ex rel., 637 F.3d at 1058-59*; *Bautista, 216 F.3d at 841-42*. If Gardner chooses to file a second amended complaint, he is again reminded that he must **separately** state his **[*26]** claims as distinct causes of action instead of grouping multiple theories of liability together into one overtly broad cause of action. In addition, any amended complaint must allege specific causes of action, as opposed to identifying broad swaths of the federal code that contain multiple causes of action and must plead facts for the elements of the specific claim alleged such that the claim asserted is plausible. *See Iqbal, 556 U.S. at 678*. If Gardner again mixes multiple theories of liability under Title VII within one cause of action, the cause of action will be subject to dismissal with prejudice.

**2. Retaliation Under Title VII (Fifth Cause of Action) and Nevada State Law (Ninth Cause of Action)**

A prima facie case for retaliation under Title VII requires the plaintiff to show that: (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between the protected activity and adverse action. *See Manatt, 339 F.3d at 800*. But-for causation is required to satisfy the third prong. *See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)*.

"Protected activities" under Title VII include opposing allegedly discriminatory acts by one's employer. *Id. at 347*; *42 U.S.C. 2000e-3(a)*. They also include making informal complaints to one's supervisor. *Ray v. Henderson, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000)*. "When an employee protests the actions of a supervisor, **[*27]** such opposition is a 'protected activity.'" *Trent v. Valley Elec. Ass'n Inc., 41 F.3d 524, 526 (9th Cir. 1994)*. Further, if an employee communicates to his employer a reasonable belief that the employer has engaged in a form of employment discrimination, that communication constitutes opposition to the activity. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)*. The Ninth Circuit defines "adverse employment action" as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray, 217 F.3d at 1242-43*.

Assuming the truth of the allegations asserted, Gardner plausibly alleges retaliation claims under Title VII and *NRS 613*. Gardner states he "engaged in protected activity when he met with Dr. Hovenic and complained about Sage Ridge's racial discrimination of DOE and E.O." and when he refused what he believed to be a "racially motivated"

---

[3] The same issues exist in Gardner's parallel state law claim. Gardner asserts the "terminat[ion] [of] his employment as retaliation", (ECF No. 26 at 24, ¶ 147), which goes to a retaliation claim. *See Fonseca, 374 F.3d at 847 (9th Cir. 2004)*. In the prior paragraph, Gardner alleges that Dr. Hovenic made insulting comments to Gardner regarding his race, (ECF No. 26 at 23-24, ¶ 146), which goes to hostile work environment. *See Meritor Sav. Bank, FSB, 477 U.S. at 65 (1986)* ("Title VII affords the right to work in an environment free from discriminatory intimidation, ridicule, and insult.").

request from Dr. Hovenic to unenroll Doe. (ECF No. 26 at 20, ¶¶ 116, 117.) Gardner then states that "Sage Ridge took adverse employment action against Gardner by terminat[ion of] his employment." (ECF No. 26 at 20, ¶ 118.) He further states his termination was a "direct response to his opposition" to Dr. Hovenic's request to unenroll Doe and because of his complaints regarding racial discrimination." **[*28]** (ECF No. 26 at 20, ¶¶ 116-119.)

Sage Ridge argues Gardner's alleged protected activity does not meet the first and third elements of a Title VII retaliation claim because they do not have to do with the workplace. (ECF No. 37 at 9.) However, the Ninth Circuit has made clear that protected activity need not be limited as Sage Ridge suggests. *See Ray, 217 F.3d at 1240* (holding that the plaintiff "engaged in protected activities when he complained of the treatment of women . . . both informally and formally). "[I]nternal complaints constitute protected activity when a reasonable person would believe the conduct the complaint reports violates Title VII." *E.E.O.C. v. Tesla, Inc., 727 F. Supp. 3d 875, 893-94 (N.D. Cal. 2024)* (citing *E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 963-64 (9th Cir. 2009)*); *Kurdi v. Cal. Dep't of Transp., No. 1:22-CV-00729-JLT EPG, 2023 U.S. Dist. LEXIS 8616, 2023 WL 267538, at *6 (E.D. Cal. Jan. 18, 2023)* ("reporting harassment, discrimination, and/or retaliation, or what an employee reasonably believes to be a violation of Title VII, may constitute a protected activity"). As Sage Ridge puts it, Gardner was "required to . . . support the student body." (ECF No. 29 at 3.) Gardner's alleged protected activities have to do with how students—particularly his son—are treated at Sage Ridge and actions Dr. Hovenic specific requested of Gardner that he believed were "racially motivated." (ECF No. 26 at 20.)

Accepting all the factual allegations in the FAC **[*29]** as true and drawing all reasonable inferences in Gardner's favor, the Court finds he has sufficiently pled a prima facie case for retaliation under Title VII and *NRS 613*.[4] *See Retail Prop. Tr., 768 F.3d at 945*.

### C. Gardner's Retaliation Claim Under 42 U.S.C. § 1981 (Sixth Cause of Action)

Like Title VII, *42 U.S.C. § 1981* "prohibits discrimination in the 'benefits, privileges, terms and conditions' of employment." *Surrell, 518 F.3d at 1103* (quoting *42 U.S.C. § 1981(b)*). The "legal principles guiding a court in at Title VII dispute apply with equal force in a *§ 1981* action." *Manatt, 339 F.3d at 797*; *see Norman v. Clark Cnty. Dep't of Juv. Just. Servs., 244 F. Supp. 3d 1085, 1091 (D. Nev. 2017)* ("The legal principles governing a *section 1981* retaliation claim and a Title VII retaliation claim are the same.").

To establish retaliation under *Section 1981*, Gardner must meet the same requirements as a retaliation claim under Title VII. As stated above, the Court finds Gardner has plausibly alleged a Title VII retaliation claim. Under the sixth cause of action of the FAC, Gardner "incorporate[s]" by reference the allegations from prior paragraphs. (ECF No. 26 at 21, ¶ 122.) He alleges the same facts regarding protected activity, adverse actions, and casual link between protected activity and adverse employment action. (*See id.* at 21, ¶ 122-127.)

Accordingly, Gardner's *42 U.S.C. § 1981* retaliation claim is sufficiently pled.

### D. Gardner's Claim Under the ADA (Seventh [*30] Cause of Action)[5]

---

[4] Under the ninth cause of action of the FAC, Gardner "incorporates" by reference the allegations from prior paragraphs. (ECF No. 26 at 24, ¶ 151.) He alleges the same facts regarding protected activity, adverse actions, and casual link between protected activity and adverse employment action. (*See id.* at 24-25, ¶ 151-160.)

[5] "Under the ADA an 'employer' is not covered unless its work force includes '15 or more employees ....'" *Clackamas Gastroenterology Assocs., P. C. v. Wells, 538 U.S. 440, 441-42, 123 S. Ct. 1673, 155 L. Ed. 2d 615 (2003)* (quoting *42 U.S.C. § 12111(5)*). Gardner provides Sage Ridge's PPP loan information which states Sage Ridge reported 67 jobs. (ECF No. 26 at 5.) Sage Ridge does not argue that the ADA does not apply to them.

Next, Sage Ridge argues Gardner's Americans with Disabilities Act ("ADA") claim must be dismissed because he "has impermissibly interwoven various ADA theories of liability into one claim." (ECF No. 29 at 19.) Gardner's seventh cause of action alleges a violation of the ADA on the part of Sage Ridge. (ECF No. 26 at 21-22.) He alleges he is disabled due to kidney failure, which requires him to work from home to obtain daily dialysis. (*Id.* at 22.) He alleges Sage Ridge was aware of the disability and initially accommodated him by permitting him to work mostly remotely but later took adverse action and retaliated by revoking his accommodation and ultimately terminating his employment at Sage Ridge. (*Id.*) In its order dismissing the original complaint, the Court warned Plaintiffs regarding the issues of "lumping" together multiple claims into one cause of action. (ECF No. 23 at 8.)

The ADA prohibits employers from discriminating against an individual based on their qualified disability. *See Rohr v. Salt River Project Agric. Imp. & Power Dist., 555 F.3d 850, 858 (9th Cir. 2009)*. The ADA permits a plaintiff to raise disability claims under multiple theories of liability. *Samper v. Providence St. Vincent Med. Ctr., 675 F.3d 1233, 1237 (9th Cir. 2012)* (Disability Discrimination); *Alvarado v. Cajun Operating Co., 588 F.3d 1261, 1264 (9th Cir. 2009)* (Retaliation); *Dunlap v. Liberty Nat. Prods., Inc., 878 F.3d 794, 797-98 (9th Cir. 2017)* (Failure to Make Reasonable Accommodations). [*31] However, each theory must be raised independently. *See Swafford, 383 F. Supp. 3d at 925 (N.D. Cal. 2019)* ("Not only is the title of the claim incomplete because it fails to mention the [correct statute], but also lumping all of these claims together into one cause of action is improper."); *Hayek, 2011 U.S. Dist. LEXIS 132677, 2011 WL 6819075, at *4* ("[W]hen the pleading reflects a jumble of legal causes of actions and theories that fails to give defendants fair notice of what the plaintiff's claims actually are and the grounds upon which they rests, the complaint does not meet the standards of *Rules 8* or *12*.").

Just like with Gardner's original complaint and with his "Violation of Title VII" claim in the FAC, the Court is unable to determine what specific cause of action Gardner seeks to bring under the ADA. The Court's reading of the seventh cause of action again leads to the conclusion that Gardner's ADA "cause of action includes multiple claims each requiring different elements, defenses, discovery and bases of judgment." *See Larios, 2022 U.S. Dist. LEXIS 245650, 2022 WL 20717421, at *4*. Here, Gardner alleges "Sage Ridge failed to engage in the interactive process to determine and provide Gardner with an alternative reasonable accommodation" (ECF No. 26 at 22, ¶ 134), which goes to a failure to make reasonable accommodations claim. *See Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001)* ("Once an employer [*32] becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations.") Two paragraphs later, within the same cause of action, Gardner alleges "retaliation" and "adverse action," (ECF No. 26 at 22, ¶ 136), which goes to an ADA retaliation theory of liability. *See Pardi v. Kaiser Foundation Hosps., 389 F.3d 840, 849-50 (9th Cir. 2004)*.

It is difficult for the Court to discern whether Gardner has alleged a plausible claim for relief because numerous ADA allegations are merely lumped together into one cause of action. The Court finds that Gardner has violated *Rules 8* and *10* by combining together multiple claims into one cause of action. *Motallebi, 2020 U.S. Dist. LEXIS 265713, 2020 WL 13327502, at *3* ("Combining separate legal claims under one cause of action is improper under *Rule 8*."). The inclusion of facts to support distinct claims within one cause of action provides grounds for the Court to dismiss this cause of action. *See Cafasso, U.S. ex rel., 637 F.3d at 1058-59*; *Bautista, 216 F.3d at 841-42*.

Accordingly, Gardner has not sufficiently pled a plausible claim for relief within his seventh cause of action and the Court again grants dismissal without prejudice and with leave to amend. *See Cafasso, U.S. ex rel., 637 F.3d at 1058-59*; *Bautista, 216 F.3d at 841-42*. If Gardner chooses to file a second amended complaint, he is [*33] again reminded that he must separately state his claims as distinct causes of action instead of grouping them together into one overtly broad cause of action. In addition, any amended complaint must allege specific causes of action, as opposed to identifying broad swaths of the federal code that contain multiple causes of action and must plead facts for the elements of the specific claim alleged such that the claim asserted is plausible. *See Iqbal, 556 U.S. at 678*. If Gardner again mixes multiple ADA theories of liability within one cause of action, the cause of action will be subject to dismissal with prejudice.

**E. Plaintiffs' Intentional Infliction of Emotional Damages Claims (Tenth and Eleventh Causes of Action)**

Next, Sage Ridge argues Gardner and Doe's tenth and eleventh causes of action asserting intentional infliction of emotional distress ("IIED") are inadequately pled. (ECF No. 29 at 22-23.) Sage Ridge asserts, even if the Court accepts Plaintiffs' allegations of the IIED claims as true, they do not rise to the "scorched-earth tactics" that this Court has recognized as "extreme and outrageous behavior." (*Id.* at 23.) Rather, Plaintiffs merely allege they were forced to apologize to a room full of white [*34] students and parents who falsely accused Doe and Gardner for making them feel unsafe and uncomfortable. (ECF No. 26 at 27.) Doe alleges he was further subject to extreme and outrageous conduct based on actions of Sage Ridge students and teachers such as accusing him of displaying gang signs, segregating him from other students during a field trip, suspending him because of the false accusations, and expulsion without cause. (*Id.*) Gardner alleges Sage Ridge leadership made discriminatory comments towards him such as an alleged racial quota at the school and "I don't know what black people want to be called: Black, Afro American, Colored." (*Id.* at 26.)

To state an IIED claim under Nevada law, the plaintiff must allege (1) the defendant engaged in "extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress," (2) the plaintiff "suffered severe or extreme emotional distress," and (3) "actual or proximate causation." *Star v. Rabello, 97 Nev. 124, 625 P.2d 90, 91-92 (1981)*; *see Okeke v. Biomat USA, Inc., 927 F. Supp. 2d 1021, 1029 (D. Nev. 2013)*. "Extreme and outrageous conduct is conduct which is 'outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community.'" *Okeke, 927 F. Supp. 2d at 1029* (quoting *Maduike v. Agency Rent-A-Car, 114 Nev. 1, 953 P.2d 24, 26 (1998)*. "General physical or emotional discomfort [*35] is insufficient to demonstrate severe emotional distress—a plaintiff must allege such 'serious emotional distress' that it 'results in physical symptoms.'" *Evans v. Hawes, 718 F. Supp. 3d 1351, 1373 (D. Nev. 2024)* (quoting *Chowdhry v. NLVH, Inc., 109 Nev. 478, 482, 851 P.2d 459, 461 (1993)*).

In Nevada, it "is well established that whether specific conduct is extreme and outrageous is a factual determination for the jury." *Mikhalsky v. Tran, 555 P.3d 285 (Nev. App. 2024)*; *see Posadas v. City of Reno, 109 Nev. 448, 851 P.2d 438, 444 (Nev. 1993)* ("Whether the issuance of a press release which could be interpreted as stating that a police officer committed perjury is extreme and outrageous conduct is a question for the jury."). "[The] jury [is] entitled to determine, considering prevailing circumstances, contemporary attitudes and Cheryl's own susceptibility, whether the conduct in question constituted extreme outrage." *Branda v. Sanford, 97 Nev. 643, 637 P.2d 1223, 1227 (1981)* (internal quotation marks omitted. Here, Plaintiffs' allegations of "sexual threats," "false police reports," teachers asking Doe "to make gang signs," "wrongly suspend[ing] DOE for ten days based on students' false allegations and false police reports," "forced" apologies by DOE and Gardner, two black males, "before a room full of the white students . . . and their parents" as well as racially directed comments regarding racial quotas and Gardner's race by Sage Ridge leaders are sufficient for the eventual [*36] factfinder to determine whether such conduct arises to "extreme and outrageous conduct." (ECF No. 26 at 25-27.)

Unlike the original complaint, the Plaintiffs have pled emotional distress and causation in the FAC: "anxiety, humiliation, loss of self-confidence, loss of sleep and appetite and reputational harm as a result of the aforementioned extreme and outrageous conduct committed by Sage Ridge." (ECF No. 26 at 26, ¶166; 27, ¶177); *see Russo v. Shac, LLC, 137 Nev. 959, 498 P.3d 1289 (Nev. App. 2021)* (finding Plaintiff's allegations of suffering "from anxiety, sleeplessness, and depression" as sufficient to allege significant emotional distress). Nevada has adopted the sliding-scale approach to proving a claim for IIED. *See Franchise Tax Bd. of State of California v. Hyatt, 133 Nev. 826, 407 P.3d 717, 742 (Nev. 2017)*, rev'd on other grounds *Franchise Tax Bd. of California v. Hyatt, 587 U.S. 230, 139 S. Ct. 1485, 203 L. Ed. 2d 768 (2019)*. Under this approach, "while medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered." *Id.*

Thus, the Court finds Plaintiffs have sufficiently pled plausible claims of IIED damages as part of their tenth and eleventh causes of action.

## F. Plaintiffs' [*37] Claim of Negligent Supervision and Retention (Twelfth Cause of Action)

In Plaintiffs' FAC, Gardner raises a new claim of negligent supervision and retention under Nevada Law. (ECF No. 26 at 28.) Sage Ridge argues that Gardner's claim is deficient because "[n]owhere in his pleading does he contend that he ever told Sage Ridge about the behavior he now complains of." (ECF No. 29 at 25.) According to Sage Ridge, "Gardner never even reported, to allow the school something to act on" the alleged misconduct. (ECF No. 37 at 13.) Plaintiffs do not address their negligent supervision and retention claim in their opposition to Sage Ridge's motion to dismiss. (*See* ECF No. 35.)

In Nevada, "an employer [] 'has a duty to use reasonable care in the training, supervision, and retention of [its] employees to make sure the employees are fit for their positions." *Freeman Expositions, LLC v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 520 P.3d 803, 811 (Nev. 2022) (quoting Hall v. SSF Inc., 112 Nev. 1384, 930 P.2d 94, 99 (Nev. 1996)). To establish a claim for negligent hiring, training, retention, or supervision of employees, a plaintiff must show (1) a duty of care defendant owed the plaintiff; (2) breach of "that duty by hiring, training, retaining, and/or supervising an employee even though defendant knew, or should have known, of the employee's dangerous propensities; **[*38]** (3) the breach was the cause of plaintiff's injuries; and (4) damages." *Id.* (quoting Peterson v. Miranda, 57 F. Supp. 3d 1271, 1280 (D. Nev. 2014)). "An employee's wrongful behavior does not in and of itself give rise to a claim for negligent training and supervision." *See* Okeke, 927 F. Supp. 2d at 1028. (cleaned up). If a plaintiff "allege[s] that he was subject to discriminatory treatment from his supervisor, that he complained about this treatment, and that [his employer] did nothing about it," then his "allegations are sufficient to state a claim that [the employer] did not exercise reasonable care in training or supervising [the] supervisor." *Id.*

Here, Plaintiffs have not alleged sufficient facts to show that Sage Ridge was aware or how they should have known about Dr. Hovenic's alleged conduct. No allegations are made that show Gardner or anyone else reported Dr. Hovenic or other conduct to others at Sage Ridge.

Accordingly, Plaintiffs have not sufficiently pled a plausible claim for relief within his twelfth cause of action and the Court again grants dismissal without prejudice and with leave to amend. *See* Cafasso, U.S. ex rel., 637 F.3d at 1058-59; Bautista, 216 F.3d at 841-42. If Gardner chooses to file a second amended complaint, he is again reminded that he must <u>separately</u> state his claims as distinct causes of action instead of grouping **[*39]** them together into one overtly broad cause of action. In addition, any amended complaint must allege specific causes of action, as opposed to identifying broad swaths of the federal code that contain multiple causes of action and must plead facts for the elements of the specific claim alleged such that the claim asserted is plausible. *See* Iqbal, 556 U.S. at 678. If Gardner again mixes multiple theories of liability within one cause of action, the cause of action will be subject to dismissal with prejudice.

## IV. CONCLUSION

Accordingly, **IT IS THEREFORE ORDERED** that Sage Ridge's Renewed Motion to Dismiss, (ECF No. 29), is **GRANTED IN PART AND DENIED IN PART**:

- Plaintiffs' **FIRST, SECOND, AND THIRD CAUSES OF ACTION** are **DISMISSED WITH PREJUDICE**.

- Plaintiffs' **FOURTH, SEVENTH, EIGHTH, AND TWELFTH CAUSES OF ACTION** are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**.

- Plaintiffs' **FIFTH, SIXTH, NINTH, TENTH, AND ELEVENTH CAUSES OF ACTION SHALL PROCEED**.

**IT IS FURTHER ORDERED** that if Plaintiffs choose to file a second amended complaint curing the deficiencies, as outlined in this order, Plaintiffs should file the second amended complaint within 30 days from the date of this Order. If Plaintiffs choose not to file a second **[*40]** amended complaint curing the stated deficiencies, Plaintiffs will proceed on the Fifth, Sixth, Ninth, Tenth, and Eleventh causes of action only.

**IT IS SO ORDERED**.

**DATED**: June 17, 2025.

/s/ Carla Baldwin

**UNITED STATES MAGISTRATE JUDGE**

---

**End of Document**