| | | |
|---|---|---|
| **LANCE AND CHRISTIANA TORBETT** | ) | |
| **As biological parents and next friends of** | ) | |
| **minor Plaintiff L.T.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: 2:25-cv-00033** |
| **v.** | ) | |
| | ) | **JURY DEMANDED** |
| **PROVIDENCE ACADEMY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Providence Academy ("Defendant" or "Providence Academy"), by and through counsel, hereby files this Memorandum of Law in Support of its Motion to Dismiss as to all claims contained in the Complaint filed by Plaintiffs Lance and Christiana Torbett as biological parents and next friends of minor Plaintiff L.T. (the "minor Plaintiff") (collectively "Plaintiffs").

## FACTS

Defendant is a private Christian school that was formed in 1994, and since 1995 has held tax-exempt status with the Internal Revenue Service under Section 501(c)(3). Exhibit A, Declaration of Benjamin Holland ("Holland Decl.") ¶ 3; Exhibit 1 to the Holland Decl., Grant of Providence Academy's status under 501(c)(3). Defendant did not receive funding from the federal government until the extraordinary conditions created by the COVID-19 pandemic and associated lock-down procedures implemented , when it applied for and received loans through the Paycheck Protection Program ("PPP") Holland Decl. ¶ 4-5. Those monies were borrowed from Acclivity Financial, a subsidiary of Citizens Bank, and were used to pay Defendant's teachers and staff from April 17, 2020,

1

through June 30, 2020. *Id*. at ¶ 5-6; <u>Exhibit 2</u> to the Holland Decl., Payroll Summary for Providence Academy. Defendant later sought forgiveness of the PPP loans and interest, which was granted by the Small Business Administration. Holland Decl. ¶ 7-8; <u>Exhibit 3</u> to the Holland Decl., Providence Academy's PPP Loan Forgiveness Application Form 3508EZ; <u>Exhibit 4</u> to the Holland Decl., Notice of Loan Forgiveness from Acclivity Financial and Citizens Bank dated November 6, 2020. That period was the only time in which Defendant received any federal funds. Holland Decl. ¶ 11. Defendant has never otherwise applied for or received federal financial assistance for administration, training, or other benefits of any kind. *Id*.

During the 2023-2024 school year, the minor Plaintiff was a student at Defendant's school. Am. Compl. ¶ 3, 9. As part of enrolling the minor Plaintiff at the school, Lance and Christiana Torbett signed the 2023-2024 Providence Academy Student/Parent Handbook ("Student Handbook"). <u>Exhibit 5</u> to the Holland Decl. (see also Docket Entry No. 26-1); <u>Exhibit B</u>, Plaintiff Lance Torbett's Responses to Request for Admissions ("RFA Responses") #13-14.

On February 11, 2024, the minor Plaintiff attended a Super Bowl party at a private residence (the "Super Bowl party"). *Id*. at ¶ 3; RFA Responses #1. The Super Bowl party was not a school function, it did not take place on school property, and no employee Providence Academy was in attendance. Holland Decl. ¶ 14. On February 15, 2024, Providence Academy received a report that the minor Plaintiff attended the Super Bowl party, and while there, he and other minors present assaulted another minor child (the "complaining minor") who was also a student at Providence Academy. *Id*. at ¶ 15. Immediately after receiving the report of the alleged assault, Providence Academy notified the Department of Children's Services and local law enforcement about the allegations, as required by law. *Id*. at ¶ 16; Tenn. Code Ann. § 49-6-1601. During Defendant's investigation of the allegations, the minor Plaintiff admitted to actions that constituted assault on the

complaining minor. Holland Decl. ¶ 17. Three other minors who attended the private Super Bowl party and who were also students at Providence Academy were also interviewed and found to have been involved in the incident to a lesser degree. *Id*. at ¶ 18. The complaining minor made a report to law enforcement of the incident, and the minor Plaintiff was referred to the Juvenile Court for Washington County, Tennessee, for prosecution. Am. Compl. ¶ 6. The minor Plaintiff ultimately pleaded guilty to a lesser charge and received a sentence of probation. *Id*. at ¶ 7.

At the conclusion of its investigation, Providence Academy determined to expel the minor Plaintiff. The other minors involved in the assault given suspensions. Holland Decl. ¶ 20. After Defendant made the determination to expel the minor Plaintiff on February 21, 2024, Ben Holland, Head of School at Providence Academy, began composing a letter to Plaintiffs Lance and Christiana Torbett to notify them of the expulsion of the minor Plaintiff. However, on that same date and before he completed the letter, he received an email from Lance Torbett notifying him that Plaintiffs were withdrawing the minor Plaintiff from Providence Academy effective immediately. *Id*. at ¶ 21; Exhibit 6 to Holland Decl., Email exchange between Benjamin Holland and Lance Torbett dated February 21, 2024; RFA Responses ## 20-21. Mr. Holland responded to confirm receipt of their notice of withdrawal of the minor Plaintiff, and included the language he had drafted for the letter to them in which Plaintiffs were instructed that the minor Plaintiff would no longer be permitted on campus or at events sponsored by Providence Academy. *Id*.

Plaintiffs commenced this suit on February 7, 2025, asserting claims under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and various state law claims, including "negligence, breach of contract, malicious prosecution, and [*sic*] false imprisonment, and outrageous conduct." Complaint ¶¶ 8-9. Defendant filed a Motion to Dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) on April 28, 2025. After seeking leave to amend their Complaint, Plaintiffs

filed an Amended Complaint on August 5, 2025, which abandoned Plaintiffs' claims for negligence, malicious prosecution, false imprisonment, and outrageous conduct, but continued to assert claims under Title IX and a theory of breach of contract. Amended Complaint ("Am. Compl."), Docket Entry No. 40.

In their Amended Complaint, Plaintiffs allege that the "minor Plaintiff had consistently attended Defendant's institution since the minor Plaintiff was enrolled in kindergarten," and that "at the time [of] the minor Plaintiff['s] expulsion during the 2023-2024 academic year, the minor plaintiff was in eighth grade." *Id*. at ¶ 9. Plaintiffs allege that the complaining minor made allegations against the minor plaintiff arising from events that occurred at a Super Bowl party "at a fellow student's home." *Id*. at ¶¶ 3-4. Plaintiffs do not allege that the party was a school-sponsored or school-sanctioned event, nor do they allege that employees of Defendant were present at the party. *Id*., *supra*. Plaintiffs allege "[a]t the instigation of the complaining minor," the minor plaintiff was prosecuted in the Juvenile Court for Washington County, Tennessee, arising from his actions at the private party, and that the minor plaintiff ultimately "plea[ded guilty] to a lesser charge," and that he has "since completed probation." *Id*. at ¶¶ 6-7. Despite the guilty plea of the minor Plaintiff, Plaintiffs insist that the Defendant acted negligently, wrongly, recklessly, or maliciously when it suspended and expelled the minor Plaintiff. *Id.* at ¶ 8.

With respect to Title IX, Plaintiffs allege that "Defendant is an educational institution as defined by Title IX of the Educational Amendments of 1972, 20 U.S.C. Section 1681, *et seq*." Amended Complaint ¶ 2. Plaintiffs further allege that "Defendant accepted monies and other benefits through the Paycheck Protection Program ('PPP') administered by the Small Business Administration and/or other agencies of the federal government." *Id*. at ¶ 2. Plaintiffs also alleged in their Amended Complaint that "Defendant applied for and received tax exempt status from the federal government

which also constitutes federal financial assistance," and that "Defendant has likewise received federal financial assistance utilizing federal monies and benefits in the administration of and/or attending training and other sessions, grants and other benefits." *Id.* Plaintiffs' Title IX claims are based on an allegation that "Defendant failed to conduct a full and fair inquiry, or provide the minor Plaintiff with a modicum of due process concerning its decision making of the alleged incident [assault by the minor Plaintiff of another minor at a private party]" and that "Defendant failed to investigate any aspect of the complaint against the minor Plaintiff." *Id.* at ¶ 8.

Plaintiffs also asserted a Tennessee state law claim under a theory of breach of contract and attached a copy of the Providence Academy Student/Parent Handbook for the 2023-2024 school year as the contract that Plaintiffs alleged to have been breached by Defendant. Docket Entry. No. 26-1. Plaintiffs' Amended Complaint alleges that "Defendant's failure to abide by its own policies and procedures and its treatment of the minor Plaintiff constitutes breach of contract to which Defendant is liable." *Id.* at ¶ 10. However, the Amended Complaint does not identify any provision, policy, or procedure allegedly breached by Defendant. *Id*, *supra*.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024).

Applying motions for summary judgment to contracts, "[i]f a contract is in writing and its terms are clear and unambiguous, we ascertain the contract's meaning in accordance with the contract's plainly expressed intent." *Trs. of the Rion Workers Defined Contribution Pension Fund v.*

*Next Century Rebar, LLC*, 115 F.4th 480, 490 (6th Cir. 2024) (quoting *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 562 (6th Cir. 2015). If the terms of the contract could be reasonably interpreted in two different fashions, then extrinsic evidence is allowed to ascertain the true meaning of the contract. *Rion Workers*, 115 F.4th at 490. However, when the terms of the contract are clear and there is no legal question at stake, summary judgment is proper. *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407 (6th Cir. 2024). In *Avantax*, the court evaluated whether a force majeure clause was enforceable when COVID-19 frustrated the purpose of the contract. Id. at 415, 416. The Court held that since the contract was unambiguous and COVID-19 restrictions would frustrate the basis of the contract, then the lower court's granting of the motion for summary judgment should be granted. *Id*. at 420.

## LAW AND ARGUMENT

### A. **Plaintiff's claims under Title IX fail as a matter of law.**

With respect to alleged violations of Title IX, the Amended Complaint, like the original Complaint before it, contains only bare legal conclusions. Specifically, Plaintiffs allege that Defendant is subject to Title IX on three different grounds:

> Defendant is an education institution as defined by Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, et seq. Defendant purports to provide educational services to students in grades kindergarten through twelfth grade. . . . Defendant is subject to Title IX by virtue of its acceptance of financial assistance as defined by the act. Plaintiffs aver that <u>Defendant accepted monies and other benefits through the Paycheck Protection Program ("PPP") administered by the Small Business Administration and/or other agencies of the federal government</u>. Plaintiffs also aver that <u>Defendant applied for and received tax exempt status from the federal government which also constitutes federal financial assistance</u>. Plaintiffs further aver upon information and belief that the <u>Defendant likewise received federal financial assistance utilizing federal monies and benefits in the administration of and/or attending training and other sessions, grants and other benefits</u>.

6

Am. Compl. ¶ 2 (emphasis added). The Complaint later states: "The Plaintiffs aver the aforementioned conduct violated Title IX of the Educational Amendments of 1972, 20 U.S.C. Section 1681, et seq." *Id*. at ¶ 8.

In order to prevail in their claims under Title IX, Plaintiffs must prove sufficient facts to support a finding that Defendant is subject to Title IX. In order to do so, Plaintiffs must establish facts to show that Defendant was a "recipient" of federal financial assistance within the meaning of 34 C.F.R. § 106.2. *NCAA v. Smith*, 525 U.S. 459 (1999). Specifically, 34 C.F.R. § 106.2 defines "recipient" to include any entity to which "federal financial assistances is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof." Although Title IX does not define federal financial assistance, Department of Education regulations define "federal financial assistance" for the purposes of Title IX as follows:

> Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
>
> > (1) A grant or loan of Federal financial assistance, including funds made available for:
> >
> > > (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
> > >
> > > (ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
> >
> > (2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
> >
> > (3) Provision of the services of Federal personnel.
> >
> > (4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

7

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2.

Plaintiffs have raised three theories under which they allege Defendant was a "recipient" of federal financial assistance: (1) receipt and/or forgiveness of PPP loans, (2) receipt of tax-exempt status for federal tax purposes, and (3) "utilizing federal monies and benefits in the administration of and/or attending training and other sessions, grants, and other benefits." Am. Compl. ¶ 2. As argued more fully below, each such theory fails as a matter of law.

1. Defendant's receipt of PPP loans does not subject it to Title IX.

The first and apparently primary basis for Plaintiffs' allegation that Defendant is subject to Title IX is because it received a PPP loan during the COVID-19 pandemic. It is undisputed that Defendant applied for a PPP loan in 2020. Defendant used those funds to make payroll payments to its roughly teachers and staff during the period from April 17, 2020, to June 30, 2020. Holland Decl. ¶ 6. Defendant later applied for forgiveness of that loan which was granted on or about November 7, 2020. Holland Decl. ¶¶ 7-8; Exhibit 3 to Holand Decl., Providence Academy's PPP Loan Forgiveness Application; Exhibit 4, Notice of Loan Forgiveness from Aclivity Financial and Citizens Bank dated November 7, 2020.

Whether PPP loans subject a party to Title IX has been the subject of litigation in multiple federal courts since the implementation of PPP loans in 2020 in the early days of the COVID-19 pandemic. As the District Court for the District of Nevada has noted, "Given the nature of the COVID-19 Pandemic and the urgency behind the PPP loans, it is likely that little thought was given as to whether such loans counted as 'receiving federal financial assistance.'" *Gardner v. Sage Ridge*

*Sch.*, No. 3:24-CV-00403-CLB, 2025 U.S. Dist. LEXIS 114896, at *18 (D. Nev. June 17, 2025). The court in *Gardner* went on to provide the following background:

> PPP loans were enacted by Congress by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") during the unprecedent COVID-19 Pandemic. *See* 15 U.S.C. § 636(a)(36). The CARES Act and the PPP loans programs were enacted as "assistance and [a] health care response for individuals, families, and businesses affected by the coronavirus pandemic." Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120). PPP loans were enacted to assist small businesses to continue operations and "keep[] workers paid and employed across the United States" during the COVID-19 crisis. *Id.* Unlike typical SBA loan programs, a PPP loan could be made to "any [small] business," non-profit organization, [*19] and other organization or business concern that qualifies as small under industry-specific rules. 15 U.S.C. § 636(a)(36)(D)(i). The SBA's guidance regarding the PPP loans notes that while the loans were eligible "for forgiveness of up to the full principal amount," the nature of the program was "temporary." 85 Fed. Reg. 20811. The loans were based on eight weeks of payroll and business costs. *Id.* Loans issued before June 5, 2020 had a maturity date of two years. *Id.* at 20813. But nowhere in the statutes or federal regulations regarding the PPP loans are there any references or clear conditions to abide by Titles VI or IX. *See* 15 U.S.C. § 636; 85 Fed. Reg. 20811.

*Gardner*, 2025 U.S. Dist. LEXIS 114896 at *18.

One of the first courts to examine the question of whether PPP loans or forgiveness constituted "federal financial assistance" for the purposes of Title IX was the District Court for the Eastern District of North Carolina, in *Karanik v. Cape Fear Academy*. In *Karanik*, the District Court Judge concluded that "[a] PPP loan is 'federal financial assistance' subject to Title IX because it is "[a] grant or loan of Federal financial assistance" 34 C.F.R. § 106.2(g)(1). After all, "the PPP is, in substance and in form, a loan program." *Karanik v. Cape Fear Academy*, 608 F. Supp. 3d 268, 281 (E.D.N.C. 2022) (citing *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 423 (2nd Cir. 2022)). The court in *Karanik* went on to hold that the school in that case "had to comply with Title IX for the life of its loan." *Karanik*, 608 F. Supp. at 284 (emphasis added). Because the plaintiffs in *Karanik* alleged that the discriminatory behavior occurred during the loan period of the PPP loans obtained by the school in that case, the plaintiffs were allowed to proceed with their claim. Notably, that factual

9

scenario differs from the case at bar, which involves acts occurring in February 2024, long after the loan period of the PPP loans obtained by Defendant.

In its recent ruling on June 17, 2025, the U.S. District Court for the District of Nevada assessed all current case law on the interplay of Title IX and PPP loans, and its analysis is instructive. In *Gardner v. Sage Ridge School*, parents of a minor child brought suit against the defendant school asserting various causes of action, including violations of Title IX of the Education Amendments of 1972. The Court in *Gardner* evaluated those claims, and in particular, noted findings from the Middle District of Tennessee and the Third Circuit Court of Appeals in its analysis.

> Looking to other forms of federal emergency relief, regulations from the Federal Emergency Management Agency ("FEMA") specifically "effectuate the provisions of Title VI of the Civil Rights Act of 1964," 44 C.F.R. § 7.1, and "Title IX of the Education Amendments of 1972," 44 C.F.R. § 19.100. To receive FEMA funding, FEMA requires applicants to submit "assurances . . . that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 44 C.F.R. § 19.115(a). Unlike FEMA disaster relief, SBA guidance does not call out to Title VI or IX. *See* 85 Fed. Reg. 20811. Thus, the Court will not read in requirements for recipients of PPP loans, absent other forms of federal funding, to comply with Title VI or IX.
>
> Additionally, per Titles VI and IX, Sage Ridge must be *receiving* federal assistance. As the Middle District of Tennessee aptly noted: "use of the word 'receiving'—the present participle of 'receive'—makes it unequivocally clear that the program or activity at issue must be receiving, or 'com[ing] into possession of,' such assistance." *Welch v. United Network for Organ Sharing*, 767 F. Supp. 3d 746, 778 (M.D. Tenn. 2025), *adhered to on reconsideration*, No. 3:24-CV-00422, 2025 U.S. Dist. LEXIS 46909, 2025 WL 824137 (M.D. Tenn. Mar. 14, 2025) (citing Receive, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/receive (last visited February 14, 2025)). As another Court found, an entity's receipt of a PPP loan constituted "'federal financial assistance' and had to comply with Title IX for the *life* of its loan." *Karanik v. Cape Fear Acad., Inc.*, 608 F. Supp. 3d 268, 284 (E.D.N.C. 2022) (emphasis added). Sage Ridge received the loan in April 2020 for expenses covering the school the following eight weeks. The Paycheck Protection Program ended on May 31, 2021. The PPP loan that Sage Ridge received matured in April of 2022 and was forgiven in its entirety. (ECF No. 26 at 5.) Sage Ridge and Gardner did not sign their employment contract until April 17, 2023 and Doe did not enroll at Sage Ridge until later in 2023. *Id.* at 7-8.)

> The Court finds that permitting application of Titles VI and IX under the circumstances of this case would permit application of the statutes indefinitely and in situations where agreements between the federal government and entities have concluded. The Court acknowledges the unprecedent circumstances of the COVID-19 Pandemic and the needs of thousands, if not millions, of businesses. But <u>absent clear Congressional intent or federal regulatory authority, the Court will not read in Title VI or IX requirements many years past the issuance of the limited and emergency PPP loan that Sage Ridge received in 2020.</u> *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

*Gardner v. Sage Ridge Sch.*, No. 3:24-CV-00403-CLB, 2025 U.S. Dist. LEXIS 114896, at \*18-21 (D. Nev. June 17, 2025) (emphasis added). The *Gardener* court went on to hold that the plaintiffs in that case had not sufficiently alleged that the defendant school in that case receives federal financial assistance such that it would be subject to Title IX, and found that the plaintiffs in that case had failed to state a claim under Title IX against the defendant school. *Id.* at 21. The *Gardner* court further held that amendment under Fed. R. Civ. P. 15 would be futile "because no set of facts can be added to Plaintiffs' … Title IX claims that would constitute a valid and sufficient claim." *Id.*

Similarly, another recent case of *Davis v. Winston Preparatory School*, where the allegedly discriminatory actions took place before any PPP loans were sought or received, the District Court for the Southern District of New York held that Title IX did not apply to the school because the defendant school had not "received qualifying 'Federal financial assistance' — in the form of a PPP loan — <u>at a time contemporaneous with the alleged discriminatory conduct.</u>" *Davis v. Winston Preparatory Sch.*, 2025 U.S. Dist. LEXIS 123630 at \*38 (S.D.N.Y. Jun. 30, 2025) (emphasis added). Thus, though the court rulings of *Davis* and *Gardner* dealt with different time periods—one before PPP loans and one after PPP loans—their holdings are complimentary, and Defendant submits that the Court should adopt their reasoning.

11

In the case at bar, Plaintiffs' allegations and the undisputed facts are the at Defendant "received"—in the past—PPP loans and/or forgiveness. Am. Compl. ¶ 2; Holland Decl. ¶¶ 6-9. Plaintiffs do not allege that Defendant is currently receiving PPP loans through the Small Business Administration or any other federal entity, nor do they allege that Defendant was receiving such loans in February 2024 when the assault of the complaining minor child occurred. Am. Compl., *infra*. Defendant has denied receiving any federal funds since 2020, and specifically denied receiving federal funds during the 2023-2024 school year at issue in this case. Holland Decl. ¶ 10. Indeed, Defendant could not have received any PPP loans in 2024, as such loans were discontinued no later than May 31, 2021. *Gardner*, 2025 U.S. Dist. LEXIS 114896, at *20. And unlike cases such as *Karanik v. Cape Fear Academy*, 608 F. Sup. 3d 268 (E.D.N.C. 2022), the events in this case did not take place during the 2020-2021 academic year, when a school such as Defendant might be alleged to be "receiving" PPP loans. To use the terminology employed by the Southern District of New York, it is undisputed that Defendant had not "received qualifying 'Federal financial assistance' — in the form of a PPP loan <u>— at a time contemporaneous with the alleged discriminatory conduct</u>." *Davis*, 2025 U.S. Dist. LEXIS 123630 at *38 (emphasis added). As the Middle District of Tennessee has observed, the only way for the Plaintiffs' argument on the PPP loan to have merit would require this Court to "read 'receiving' as 'received,'" which runs counter to canons of construction and the plain meaning of the statute. *Welch v. United Network for Organ Sharing*, 767 F. Supp. 3d 746, 778 (M.D. Tenn. 2025).

The Court should follow the recent examples of the Southern District of New York and District of Nevada, as well as its neighbors in the Eastern District of North Carolina and the Middle District of Tennessee, and find that past receipt of PPP loans does not constitute "receiving" federal funds for the purposes of claims under Title IX.

2. <u>Defendant's tax-exempt status does not subject it to the provisions of Title IX.</u>

Perhaps aware that Defendant was not a recipient of PPP loans during the relevant period of alleged discrimination, Plaintiffs added to their Amended Complaint the allegation that Defendant was a "recipient" of federal funds in the form of its tax-exempt status. Indeed, it is undisputed that Defendant is a 501(c)(3) tax-exempt entity. Hollnd Decl. ¶ 3. However, such arguments run contrary to long-standing case law and were recently rejected by the Courts of Appeals for the Third Circuit and Fourth Circuit, and should be rejected here.

The Supreme Court, in *NCAA v. Smith*, has clarified which educational institutions are covered by Title IX and which are not: "Entities that *receive* federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that *only benefit economically from* federal assistance are not." *NCAA v. Smith*, 525 U.S. 459, 465, 119 S. Ct. 924, 142 L. Ed. 2d 929 (1999) (emphases added).

Noting the regulations contained in 34 C.F.R. § 106.2(g), which set forth the definition of "federal financial assistance" for the purposes of Title IX, the Northern District of Illinois has noted, "[C]onspicuously absent from that laundry list is income tax exemption." *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*, 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001). The District of Arizona similarly observed, "'Tax-exempt status' is not listed as a form of federal financial assistance in the Department of Education's definition and tax-exempt status is not assistance 'authorized or extended under a law administered by the Department,' as the introductory phrase of the regulatory definition requires." *Doe v. Horne*, 2023 U.S. Dist. LEXIS 240844 at *6 (D. Ariz. Dec. 11, 2023).

These holdings are consistent with long-standing Supreme Court precedent regarding tax-exempt status held by a variety of religious and private institutions. "The grant of a tax exemption is

13

not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'" *Walz v. Tax Com. of New York*, 397 U.S. 664, 675, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). In the case at bar, Plaintiffs are essentially attempting to suggest just that—the tax exempt status converted Defendant, a private Christian school, into an "arm[] of the state," which notion the Supreme Court has dismissed since 1970.

The most recent reported case addressing the issue of Title IX and tax-exempt schools was decided by the Court of Appeals for Fourth Circuit, which found that 501(c)(3) status did not constitute receipt of federal funds for the purposes of Title IX. In *Buettner-Hartsoe v. Baltimore Lutheran High School Association*, the plaintiff had brought suit against a private school under Title IX related to alleged sexual harassment and/or assault. *Buettner-Hartsoe v. Baltimore Lutheran High School Assoc.*96 F.4th 707 (4th Cir. 2024) There, as here, the defendant school was exempt from federal taxes, but denied receiving direct federal funding or federal financial assistance. The defendant school moved to dismiss, and the district court denied the motion. On appeal, the Fourth Circuit found that "the plain text of Title IX contemplates the 'transfer of funds from the federal government to an entity.'" *Id*. at 712. After surveying Supreme Court precedent construing the scope of when Federal financial assistance includes indirect assistance, the Fourth Circuit determined that the phrase "receiving Federal financial assistance" meant "taking or accepting federal financial aid, help, or support, even when that assistance is through an intermediary." *Id*. at 712-13 (citing *Grove City College v. Bell*, 465 U.S. 555, 563-70 (1984); *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986); and *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999)). The Fourth Circuit observed that "Tax exemption merely allows organizations to keep the

money they otherwise would owe in income tax," and was "unconvinced" by arguments made by the plaintiff that tax exempt status was similar to indirect grants that were at issue in *Grove City College v. Bell*, 465 U.S. 555 (1984). The Fourth Circuit went on to hold that "tax exempt status pursuant to 26 U.S.C. § 501(c)(3) does not equate to 'receiving Federal financial assistance' for purposes of Title IX," and reversed the lower court's denial of the defendant school's motion for summary judgment.

The Fourth Circuit's reasoning in *Buettner-Hartsoe* was immediately cited and followed by the District Court for the Western District of Michigan. In *Grace Chen v. Hillsdale College*, the district court relied on the "well-reasoned decision" in *Buettner-Hartsoe*, concluding "that Defendant's § 501(c)(3) status does not implicate the terms of Title IX's proposed contract with educational institutions," and dismissed the plaintiff's claims with prejudice. *Grace Chen v. Hillsdale Coll.*, 2024 U.S. Distr. LEXIS 247928, at *44-45 (D. W. Mich. Sep. 13, 2024). In so doing, the District Court in *Chen* rejected the plaintiff's argument that that court should follow the holding of *E.H. v. Valley Christian Academy*, which had found that "[t]ax exempt status confers a federal financial benefit that obligates compliance with Title IX." *E.H. v. Valley Christian Acad.*, 616 F. Supp. 3d 1040, 150 (C.D. Cal. 2022). The plaintiffs in *Chen* did not appeal "the rejection of their federal claim under Title IX, presumably because Hillsdale does not accept any funding from the federal government." *Chen v. Hillsdale Coll.*, 2025 U.S. App. LEXIS 22135 at *6 (6th Cir. 2025 Aug. 28, 2025).

Closer to home within the Sixth Circuit, in *Doe v. Currey Ingram Academy*, the Middle District of Tennessee reached a similar conclusion, that 501(c)(3) status did not constitute receipt of federal funds for the purposes of Title IX. *Doe v. Currey Ingram Acad.*, 721 F. Supp. 3d 682 (M.D. Tenn. 2024). In *Currey Ingram*, the plaintiff claimed that Currey Ingram Academy "receives federal assistance in multiple ways," and also that "Currey Ingram is a 501(c)(3) entity that is tax-exempt."

15

The Court held that these allegations were not enough and stated the "Plaintiffs have failed to satisfy the *Twombly*/*Iqbal* standard because they have failed to allege facts (taken as true, of course), that plausibly suggest that this element is satisfied." *Id.* at 690 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

> It is entirely clear to the Court that the Government's provision (through the Internal Revenue Service) to Defendant of tax-exempt status does not fit within the definition of Federal financial assistance. If one goes through each of the five categories [contained in 34 C.F.R. § 106.2(g)], it is readily apparent that none cover the mere provision of tax-exempt status. The first category manifestly would be the most likely, and yet it cannot reasonably be set that that tax-exempt status—which the Court will construe in Plaintiffs' favor to necessarily entail enabling the entity to keep funds that otherwise would be payable to the federal government as income tax—does not constitute a "grant or loan" of anything whatsoever.

*Id.* at 688.

Finally, most recently, the Southern District of New York's holding in *Davis v. Winston Preparatory School* also examined the question of whether tax exemption subjected a school to the requirements of Title IX. *Davis*, 2025 U.S. Dist. LEXIS 123630 at *39-40. The District Court in *Davis* held that the tax-exempt status defendant school in that case under "Section 501(c)(3) organization is not sufficient to demonstrate that it receives 'Federal financial assistance' for purposes of Title VI, Title IX, or the Rehabilitation Act." *Id.* at 44. Notably, in so holding, the *Davis* court declined to extend the holding from a 1988 case in the Southern District of New York that had formerly held that tax exemption could qualify as federal assistance, as well as the similar ruling of the more recent *E.H. v. Valley Christian Academy* from the Central District of California that tax-exempt status constituted receipt of federal funds. *See Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988); *Valley Christian*, 616 F. Supp. 3d at 1050. The *Davis* case, which was presented with both the PPP loan argument and the 501(c)(3) status argument, is highly

similar to the case at bar, and the *Davis* court rejected both arguments. So, too, should the Court in this matter, following the emerging line of cases both within the Sixth Circuit and beyond.

3. <u>Plaintiffs have failed to identify any basis for which Defendant would be subject to Title IX.</u>

In their Amended Complaint, Plaintiffs make a broad and vaguely worded allegation regarding some other basis for which Defendant is purportedly subject to Title IX. At the end of Paragraph 2, Plaintiffs "further aver upon information and belief that the Defendant has likewise received federal financial assistance utilizing federal monies and benefits in the administration of and/or attending training and other sessions, grants and other benefits." Am. Compl. ¶ 2. Defendant would observe that such vague allegations, made "upon information and belief," seem to indicate that Plaintiffs have no evidence for their assertions. Indeed, as Defendant has affirmatively stated, "Providence Academy did not apply for or receive federal financial assistance for administration, training, or any other benefits of any kind" beyond the singular PPP loan grant that was a result of the COVID-19 pandemic. Holland Decl. ¶ 11. To the extent that Plaintiffs' Amended Complaint attempts to assert that Defendant is subject to Title IX due to "federal monies and benefits in the administration of and/or attending training and other sessions, grants and other benefits," such allegations have been refuted and fail as a matter of law.

B. <u>Plaintiffs' claims of breach of contract fail as a matter of law.</u>

Plaintiffs' Amended Complaint refers to the 2023-2024 Providence Academy Student/Parent Handbook ("Student Handbook"), which is attached to the Declaration of Benjamin Holland as <u>Exhibit 5</u>. Plaintiffs allege that Defendant failed to "abide by its own policies and procedures and its treatment of the minor Plaintiff." Am. Compl. ¶ 8. This claim, too, fails as a matter of law, as Plaintiffs

17

cannot show nonperformance pursuant to the terms of the Student Handbook, and the plain language of the Student Handbook demonstrates that Defendant acted within the terms of the handbook when it suspended the minor Plaintiff and determined to expel him.

To recover under a breach of contract theory, a plaintiff must show (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract. *ARC LifeMed, Inc., v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). The interpretation of written agreements is a matter of law. *Guiliano v. Cleo*, 995 S.W.2d 88, 95 (Tenn. 1999). The starting point to any dispute involving the interpretation of a contract is the contract itself and the written words that appear on its face. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019) (guiding courts "to keep the written words as the lodestar of contract interpretation." (citations omitted)).

A court interprets a contract to effectuate the intent of the parties by enforcing the agreement's plain and ordinary language. See *Certain Underwriters at Lloyd's of London v. Paniagua*, 957 F. Supp. 2d 921, 924 (W.D. Tenn. 2013) (citing *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009); *Nat'l Ins. Ass'n v. Simpson*, 155 S.W.3d 134, 137 (Tenn. Ct. App. 2004)). "To state a claim for breach of contract, a plaintiff must identify the provision of a contractual agreement allegedly breached and explain how defendant's conduct constitutes a breach of the agreement." *Walton v. Carrington Mortg. Servs., LLC*, 2018 U.S. Dist. LEXIS 235051, *14 (E.D. Tenn. 2018).

As Plaintiffs have clarified in their Amended Complaint, the contract(s) that they alleged to have been breached by Defendant were "certain enrollment contracts" which "incorporated Defendant's Student Handbook by reference and implication." Am. Compl. ¶ 10. Plaintiffs have not

provided the enrollment contracts, but have provided a copy of the Student Handbook which they allege to have been breached.

The Student Handbook in question clearly states the procedures for disciplining a student within Providence Academy. It also states the Purpose and Use of the Student Handbook:

**Purposes and Use of the Parent/Student Handbook**

The purpose of the Parent/Student Handbook is to provide to all parents, students, members of the faculty and staff, and those inquiring about Providence Academy a concise presentation of the mission, philosophy, policies, and practices of Providence Academy. The Handbook provides students and their parents a set of guidelines for citizenship and behavior in and around Providence Academy. We recognize that the handbook is imperfect and silent on some issues which may arise. In cases of disagreement about a particular interpretation, the Administration and the Board of Directors of Providence Academy will render decisions that they deem fair to both the students and the school.

Student Handbook, Page 2. The Student Handbook spells out that Defendant not only had the ability but also the necessity to take the actions it did in response to the allegations and charges against the minor Plaintiff. First, Tennessee state law requires employees of Providence Academy to report abuse of a child if they have "knowledge or reasonable cause to suspect that a child who attends the school may be a victim of child abuse or child sexual abuse." Tenn. Code Ann. § 49-6-1601. That obligation includes a requirement that school officials "report the information to the department of children's services and law enforcement." Tenn. Code Ann. § 49-6-1601(d)(1)(A)-(B). Following this state law, Page 28 of the Student Handbook also indicates Providence Academy's requirements for child abuse reporting.

The conduct and discipline portion of the Student Handbook outlines clearly the rights of the school in disciplinary procedures. First, on Page 75, the handbook states:

A behavior, either on or off campus, including text messages sent after school hours, that indicates a student has little desire to live a life honoring to God, or any conduct that gives evidence of disregard for the spirit of the school standards, is sufficient cause for disciplinary action, including disenrollment, suspension, or expulsion.

Student Handbook, Page 75. Moreover, the Student Handbook states:

19

> The school generally follows the discipline procedures contained in this Handbook. However, there are circumstances in which the school administration may determine that it is appropriate not to follow discipline steps. In cases in which a student has engaged in egregious, immoral, or other unacceptable behavior, the school reserves the right to disenrollment, suspension, or expulsion of the student immediately.

*Id*. Further, in the Expulsion Section of the Student Handbook, the following are listed as examples of inappropriate conduct that are considered to be grounds for suspension or expulsion:

- Abuse of other student and their rights;
- Sexual Promiscuity;
- Activities that threaten the safety of the student or students;
- Any form of physical assault;
- Activities that violate biblical moral codes of conduct;
- A breach of conduct off campus that has an adverse effect on the testimony of the school in the community.

*Id*. at 78-79. Finally, the Student Handbook clearly defines what is constituted as Serious misconduct/infractions on Page 79, providing grounds for immediate expulsion from Providence Academy.

**Serious misconduct/infractions:** The following violations are considered conditions for immediate expulsion.

- Acts endangering the lives of other students or staff members
- Gross violence/vandalism to the school facilities
- Any violation of U.S., TN, or local laws (this includes carrying a weapon of any kind)
- Any act in clear contradiction of scriptural commands
- Use and/or possession of drugs of any kind, on or off campus

*It should be noted that the serious misconduct does not have to take place at Providence Academy or during school hours or school events for Providence Academy to take disciplinary action.*

*Id*. at 79.

All contractual agreements that existed between Plaintiffs and Defendant would still be subject to the laws of the state of Tennessee. In particularly, school teachers and school officials have an obligation to report abuse of a child if they have "knowledge or reasonable cause to suspect that a child who attends the school may be a victim of child abuse or child sexual abuse." Tenn. Code Ann.

§ 49-6-1601. That obligation includes a requirement that school officials "report the information to the department of children's services and law enforcement." Tenn. Code Ann. § 49-6-1601(d)(1)(A)-(B). Defendants complied with that legal obligation, and compliance with the law cannot constitute a breach of contract. *A&P Excavating & Materials, LLC v. Geiger*, 622 S.W.3d 237, 247-48 (Tenn. Ct. App. 2020) (citing *Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005) (courts give effect to intent of contracts "if it does not conflict with any rule of law, good morals, or public policy.")

As evidenced by the email from Plaintiff Lance Torbett withdrawing the minor Plaintiff from Defendant's school, Plaintiffs didn't wait for Defendant to expel him, they withdrew him first, though Defendant still prohibited him from school grounds or activities. Exhibit 6 to Holland Decl., Email exchange between Benjamin Holland and Lance Torbett dated February 21, 2024; RFA Responses ## 20-21. To the extent that Plaintiffs assert claims based on an alleged expulsion of the minor Plaintiff, Plaintiff's claims fail as a matter of law.

More to the point, after the complaining minor and Defendant reported the alleged assault of a minor child to the authorities, as was required of Providence Academy under Tenn. Code Ann. § 49-6-1601, the minor Plaintiff was charged, and ultimately pleaded guilty and was convicted. Am. Compl. at ¶¶ 6-7. This clearly falls under the Serious misconduct/infractions section of the Student Handbook allowing for immediate expulsion, as it was a violation of a Tennessee State law for which the minor Plaintiff eventually pleaded guilty. As such, Providence Academy moves that this court dispose of Plaintiffs' claims for breach of contract with prejudice.

## CONCLUSION

The minor Plaintiff committed a violent crime against another student at a private party off-campus. After the complaining minor commenced criminal proceedings, the minor Plaintiff was charged, pleaded guilty to aggravated reckless assault, and was sentenced. Defendant suspended the minor Plaintiff and determined to expel him, but his parents, the adult Plaintiffs in this case, withdrew him from the school before the expulsion could be delivered. The minor Plaintiff has reportedly completed probation, and Plaintiffs could have put this episode behind them and moved on. Instead, Plaintiffs filed this civil lawsuit against the Defendant school for doing its job and reporting the incident to the proper authorities. Plaintiffs' claims fail as a matter of law, they are devoid of factual support, and should not be permitted as a matter of public policy. As such, Defendant prays that the Court dismiss all Plaintiffs' claims with prejudice.

Respectfully submitted:

LEWIS THOMASON, P.C.

/s/ Peter Robison
Peter C. Robison, BPR #27498
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219
Phone: 615-259-1343
probison@lewisthomason.com

/s/ Mikel A. Towe
Mikel A. Towe, BPR #32404
900 South Gay Street, Suite 300
P.O. Box 2425
Knoxville, TN 37902
Phone: 865-546-4646
mtowe@lewisthomason.com

*Counsel for Defendant Providence Academy*

22

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Arthur Knight, III
LAW OFFICE OF ARTHUR KNIGHT, III
3248 Tazewell Pike, Ste 103
Knoxville, TN 37918
arthur@arthurfknightlaw.com

*/s/ Peter Robison*
Peter C. Robison